# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

CASCO SALES COMPANY, INC.,

Plaintiff,

v.

MARUYAMA U.S., INC.,

Defendant.

**Civil No. 10-1145 (SEC)**

## OPINION AND ORDER

Before the Court are the defendant's motion for summary judgment (Docket # 45), and the plaintiff's opposition thereto (Docket # 53). After reviewing the filings and the applicable law, the defendant's motion is **GRANTED**.

### Factual and Procedural Background

Casco Sales Company, Inc. ("Casco") brings this diversity suit against Maruyama U.S., Inc. ("Maruyama"), seeking damages resulting from the termination of an exclusive Distribution Agreement. The material facts, which are largely uncontested, follow.

On October 19, 2005, Casco, a Puerto Rican corporation, and Maruyama, a corporation organized under the laws of the state of Washington, subscribed a Distributor Policies & Agreement (the "Agreement") for distribution by Casco of Maruyama's landscape-related equipment and products in Puerto Rico. Docket # 45-1 ("SUF"), ¶¶ 1-3. The Agreement, which granted Casco the exclusive distribution of Maruyama's products, provided in pertinent part that Maruyama could terminate Casco if the latter failed to:

**CIVIL NO. 10-1145 (SEC)** **Page 2**

(a)     "[R]emit payments in a timely manner (not to exceed 90 days from due date) . . . ." Docket # 45-2, Exh. 1, p. 6.

(b)     Participate in the "annual production planning program." Id.

(c)     Furnish Maruyama with a "Monthly Inventory & Sales Report." Id. at 7.

(d)     Maintain an inadequate sales force. Id. at 6.

The parties got off to a good start. But, at some point in 2007, Casco started struggling to make payments on time. The record shows that, from April 9, 2007 to May 6, 2007, Casco had 4 past due invoices over 60 days. See SUF ¶¶ 5-16. Things got worse, and from June 6, 2008 to June 25, 2009, Casco had 6 outstanding invoices over 90 days. See id.

Apart from e-mailing Casco's outstanding invoices on a monthly basis, Maruyama regularly made it clear to Casco that it was in arrears. SUF ¶ 18. For instance, the record shows that, on July 10, 2008, a Casco agent acknowledged a debt of at least $50,420.11, but stated that payment would be delayed because Casco had obligations related to its tax payments.  Id. ¶ 18(e). On August 19, 2008, a Maruyama agent e-mailed Casco advising regarding a past due balance of $32,420.28, and that a pending order could not be filled until the past due payment was made. Id. ¶ 18(f). Maruyama similarly advised Casco of its past due balances on November 25 and December 9, 2008, on June 4, 2009, and on June 21, 2009. Id. ¶ 18(h-k).[1] Casco's debt ran as high as $111, 383.38 in December 2008. Docket # 55-1, p. 20:4-22.

_____

[1] Although Maruyama complained about Casco's late payments on many other occasions and as early as July 2006, Maruyama provided the Court with no English translations of these e-mails. Consequently, the Court disregards these documents. See D.P.R. Civ. R. 5(g).

When Maruyama complained about such outstanding balances, Casco did not remain silent. On February 2, 2009, Enrique Irizarry, Casco's President, sent a letter to Maruyama, acknowledging Casco's need to bring its "debt down." Docket # 45-4, p. 2. Because the "economic situation worldwide is extremely difficult," Irizarry wrote, "the Construction Industry in the island has been hit hard, with sales the lowest they have been in Casco's history." Id. And, asking for Maruyama's "help" in establishing "a payment plan," Irizarry underscored that he wished to continue their business together. In the same time frame, Manuel A. Galvan, Maruyama's International Sales Manager, replied, saying that Maruyama had been "flexible" in "recognizing currents events and payments efforts are very much appreciated and well noted." Docket # 55-3, p. 1.

But on February 24,  Albert Guibert, Maruyama's Regional Manager, sent another e-mail to Casco, stating that "portions of [Casco's] past due ha[d] reached 120 days due." Docket #45-3, p. 41. Guibert further wrote:

> It is important [that] we collect both the 90 day and 120 day amounts, and avoid being reviewed for referral to collections. By maintaining your account within manageable levels we can avoid affecting our ability to ship Casco Sales needed [sic], and sold [sic] Maruyama Equipment. Please review this urgent matter, and send a payment on account today, or very soon. Please review the attached updated statement of account. As always, we appreciate your business, and look forward to continuing our support of Casco Sales in the future. Id.

The next day, Casco's "VP-Operations," Johanna M. Rive, wrote back to Guibert and said that Guibert's "offer to collect immediately the balance over 90 days [was] extremely reasonable and greatly appreciated." Docket # 55-5, p. 4. "We will monitor the account and send

payments on a monthly basis to try and keep the account below that 90 day mark and become

current as soon as possible," Rive concluded. Id. That same day, Casco managed to send a check

for $13,000. Id., p. 2. Guibert then wrote back to Rive, saying that "[Maruyama] appreciate[s]

. . . [Casco's] continued business, and will cooperate as best [as] possible to provide our

support, and service to both you, and your clientele." Id., p. 3.

       About a month later, on March 31, 2009, Guibert wrote back to Rive, expressing his

dissatisfaction with the "payment plan" proposed by Casco. Docket # 55-6, pp. 3-4. "[I]t is

necessary [that] I make this request to pay the amount in the 90 day column, and the . . . planned

pay amount falls way short of the amount needed ($27, 945.09)," Guibert concluded. Id.

       The record reflects that, on April 3, 2009, Casco sent another check to Maruyama for

$10,211.42, which brought the "past due amount" to $36,814.10. Docket # 55-7, p. 2.

Maruyama's Guibert responded by saying that they are "grateful for the effort [Casco] [is]

making to maintain [the] account in good order." Docket # 55, ¶ 12.  Similarly, five days later,

Alejandra Sargent, Maruyama's International Support Coordinator, replied to Casco's latest

proposed payment plan, noting how much they "appreciate the effort that Casco is doing to

bring the account current, as we strongly want to keep making business with you guys." Docket

# 55-7, p. 1.

       Casco then made several other payments in that time frame, effectively reducing its

outstanding invoices due over 90 days to $0 by the beginning of June 2009. But by the end of

June, Casco again owed $4,360 on debt due over 90 days . In fact, according to the last invoice

sent by Maruyama at the end of June, Casco owed a total of $57, 019.42. Docket # 45-3, p. 27.

Apart from consistently breaching the Agreement's clause that required Casco's

payments not to exceed 90 days from due date, the undisputed facts show that Casco ran afoul

of other provisions that provided Maruyama grounds to terminate the Agreement. First, Casco

did not provide Maruyama with the Monthly Inventory & Sales Reports, as required by the

Agreement. SUF ¶ 20. Second, Casco refused to participate in Maruyama's 2008-2009 booking

program (described in the Agreement as the annual production planning program), or as Casco

(concededly) describes it a "program for buying by container load." Id. ¶ 21; Docket # 54, ¶ 20.

Finally, Casco also failed to hire and train outside sales personnel to assist in the marketing of

Maruyama's products (or as stated in the Agreement, Casco failed to maintain an adequate sales

force). SUF ¶ 21.[2]

On July 20, 2009, Maruyama's patience ran its toll. Thomas R. Glaze, then Vice

President & General Manager of Maruyama, sent a letter to Casco's Rive, saying that

"Maruyama ha[d] elected to take a different approach concerning the market areas currently

covered by Casco. Under the terms of the Agreement, Maruyama is giving Casco a 30 day

notice of termination of said Agreement." Docket # 45-5, p. 1. Glaze testified on his deposition

---

[2] Casco denies this statement of fact, alleging that Maruyama's "record citation does not reflect that Maruyama ever requested Casco to hire and train outside sales personnel to assist in the marketing of Maruyama's products." Docket # 22, ¶ 20. But Casco's denial is unsupported by a record citation, as required by D.P.R. Civ. R. 56(c). Consequently, the Court disregards Casco's opposing statement of material fact on this point . See D.P.R. Civ. R. 56(e).

that a "different approach" meant "a very nice way of telling somebody that we're going to go

with another distributor in your area." Docket # 55, ¶ 6. In fact, at the time of the Agreement's

termination, Maruyama had been looking at "fall back positions" for other companies that could

sell Maruyama's products in Puerto Rico. Id. ¶ 19.

Casco still owed around $50,000 to Maruyama when the Agreement was terminated,

Docket # 55-1, p. 31:18-20, and, while Casco never exceeded its credit limit of $250,000 with

Maruyama, Docket # 55, ¶ 4, Maruyama had to place several holds on Casco's orders until late

payments were addressed. SUF ¶ 18(f). It is unclear when, but at some point after the

Agreement's termination, a different company began selling Maruyama's products in Puerto

Rico. Docket # 55, ¶ 20.

Shortly thereafter, Casco's counsel wrote back to Glaze, arguing that Maruyama's

"decision to terminate the agreement without just cause constitutes not only an express breach

of the Agreement," but also violated Puerto Rico's Dealers' Contract Act of 1964 ("Law 75"),

P.R. Laws Ann. tit. 10, §§ 278-278e . Docket # 45-6, p. 1. Contending that, because Casco "was

in breach of the Agreement in multiple respects and had been for some time," Maruyama

had "just cause" to terminate the Agreement, Maruyama's counsel replied. Docket # 45-7, p. 1.

With the parties unable to resolve their disagreement outside of court, this suit soon

followed. Docket # 1. In it, Casco  alleges violations of Law 75, as well as breach of contract

and breach of duty of good faith, and seeks $500,000 in damages.

After an unsuccessful mediation attempt, see Docket # 21, and upon completion of discovery, Maruyama filed the instant motion for summary judgment, arguing that it had "just cause" to the terminate the Agreement. Docket # 45. There was "just cause," Maruyama says, because "Casco repeatedly failed to pay invoices on time, that it did not provide [it] with reports that were required by the Agreement, . . . that Casco did not participate in marketing or promotional programs generated by Maruyama, . . . and that Casco failed to employ an adequate sales force." Id., p. 5.

Casco opposed. In a nutshell, Casco alleges that because there is a genuine issue of material fact regarding whether Maruyama had "just cause" to terminate the Agreement, such a determination is unamenable via summary judgment. Docket # 53, p. 2. The real motivation behind the termination, Casco further contends, was Maruyama's decision to switch distributors in Puerto Rico.

**Standard of Review**

The Court may grant a motion for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Avery v. Hughes, 661 F.3d 690, 693 (1st Cir. 2011). In reaching such a determination, the Court may not weigh the evidence. Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 42 F.3d 668 (1st Cir. 1994). At this stage, the court construes the record in

the "light most flattering" to the nonmovant, resolving all reasonable inferences in that party's

favor. Soto-Padro v. Public Bldgs. Authority, 675 F.3d 1 (1st Cir. 2012).

The summary judgment inquiry is grounded in the factual evidence available, since "[o]ne

of the principal purposes of the summary judgment rule is to isolate and dispose of factually

unsupported claims or defenses." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). Once

the movant has averred that there is an absence of evidence to support the nonmoving party's

case, the burden shifts to the nonmovant to establish the existence of at least one fact at issue that

is both genuine and material. Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)

(citations omitted).  "A  factual issue is 'genuine' if 'it may reasonably be resolved in favor of

either party and, therefore, requires the finder of fact to make 'a choice between the parties'

differing versions of the truth at trial.'" DePoutout v. Raffaelly, 424 F.3d 112, 117 (1st Cir.

2005) (quoting Garside, 895 F.2d at 48). A material fact, in turn, is one that may affect the

outcome of the suit under the governing law. Morris v. Gov't Dev. Bank of P.R., 27 F.3d 746,

748 (1st Cir. 1994).

At any rate, to defeat summary judgment, the opposing party may not rest on conclusory

allegations, improbable inferences, and unsupported speculation. Hadfield v. McDonough, 407

F.3d 11, 15 (1st Cir. 2005) (citing Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8

(1st Cir. 1990)).  Nor will "effusive rhetoric" and "optimistic surmise" suffice to establish a

genuine issue of material fact. Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997).

Accordingly, once the party moving for summary judgment has established an absence of

material facts in dispute, and that judgment is proper as a matter of law, the "party opposing

summary judgment must present definite, competent evidence to rebut the motion." Mendez-

Laboy v. Abbot Lab., 424 F.3d 35, 37 (1st Cir. 2005) (quoting Maldonado-Denis v. Castillo-

Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994)). "The non-movant must 'produce specific facts, in

suitable evidentiary form' sufficient to limn a trial-worthy issue . . . . Failure to do so allows the

summary judgment engine to operate at full throttle." Id.; see also Kelly v. United States, 924

F.2d 355, 358 (1st Cir. 1991) (warning that "the decision to sit idly by and allow the summary

judgment proponent to configure the record is likely to prove fraught with consequence"); Mack

v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989) (holding that "[t]he evidence

illustrating the factual controversy cannot be conjectural or problematic; it must have substance

in the sense that it limns differing versions of the truth which a fact finder must resolve").

**Applicable Law and Analysis**

*Just Cause under Law 75*

Seeking to eradicate "[t]he growing number of cases in which domestic and foreign

enterprises, without just cause, eliminate their dealers . . .  as soon as these have created a

favorable market and without taking into account their legitimate interests," Medina & Medina

v. Country Pride Foods, 22 P.R. Offic. Trans. 163, 172-73 (1988) (quoting 18 Diario de Sesiones

1531 (1964)), the Puerto Rico Legislature enacted Law 75's "protective scheme." Walborg Corp.

v. Tribunal Superior, 4 P.R. Offic. Trans. 258, 104 P.R. Dec. 184, 190 (1975), overruled on other

grounds Unisys P.R., Inc. v. Ramallo Bros. Printing, 128 P.R. Dec. 842 (1991); see also Warner

Lambert Co. v. Tribunal Superior, 1 P.R. Offic. Trans. 527, 101 P.R. Dec. 378, 398 (1973)

(stating "[t]hat the reasonable stability of distribution relationship was vital for the economy of

the country, the public interest, and general welfare") (footnote omitted). Law 75 can therefore

be described as a mandatory legislative scheme that regulates the contractual relations of those

involved in the business of distributing goods in Puerto Rico. Caribbean Wholesales & Serv.

Corp. v. US JVC Corp., 855 F. Supp. 627, 634 (S.D.N.Y. 1994).  Accordingly, Law 75 provides

that "no principal or grantor may directly or indirectly perform any act detrimental to the

established relationship . . .  except for just cause." P.R. Laws Ann. tit. 10, § 278a.

       The critical issue in this case is whether Maruyama had "just cause" to terminate the

Distribution Agreement. Law 75 provides that just cause, which depends on the facts of each

case, see R.W. Int'l Corp. v. Welch Foods, 88 F.3d 49, 51 (1st Cir. 1996) (citing La Playa Santa

Marina, Inc. v. Chris-Craft Corp., 597 F.2d 1, 4 (1st Cir.1979)), is "nonperformance of any of

the essential obligations of the dealer's contract, on the part of the dealer, or any action or

omission on his part that adversely and substantially affects the interests of the principal or

grantor in promoting the marketing or distribution of the merchandise or service." P.R. Laws

Ann. tit. 10, § 278(d) (emphasis added); Warner Lambert Co., 101 P.R. Dec. at 400 ("Only when

the dealer fails to comply with any of the essential conditions or adversely affects in a substantial

manner the interest of the principal, may the latter terminate the contract without payment for

damages.")

*The late payments*

The First Circuit has repeatedly held that "paying for goods on time normally is one of the essential obligations of the dealer's contract, the non-fulfillment of which can constitute just cause under Law 75." Waterproofing Sys. v. Hydro-Stop, Inc., 440 F.3d 24, 29 (1st Cir. 2006) (citation and internal quotation marks omitted); Biomedical Instrument & Equipment Corp. v. Cordis Corp., 797 F.2d 16, 17 (1st Cir. 1986) (Breyer, J.). There is, however, a modest exception to this rule, namely the "[u]nusual, abnormal circumstance in which a supplier does not care about late payments." PPM Chemical Corp. v. Saskatoon Chemical, Ltd., 931 F.2d 138, 140, (1st Cir. 1991) (Breyer, J.).

In Biomedical, the First Circuit reversed the district court's grant of summary judgment in favor of the supplier, because a genuine issue of material fact existed "as to whether or not the parties considered [the dealer's] failure to make timely payments 'essential' . . . ." 797 F.2d at 18.  The court held that the dealer had raised a triable issue of fact as to whether overdue balances had been used as a subterfuge for termination, since there may have been evidence that the true reason for termination was the supplier's perception the dealer was not performing well. Id. The First Circuit reached this determination after finding that the "overdue balances . . . were not a matter of serious concern to the parties." Id. In Biomedical, another court in this district has said, "the parties had tacitly agreed to late payments on some occasions and the principal had not complained or showed such late payments caused it any injury." Freightliner LLC v. P.R. Truck Sales, Inc., 399 F. Supp. 2d 57, 79 n. 12 (D.P.R. 2005) (construing Biomedical).

Unsurprisingly, in arguing that Maruyama did not consider Casco's violations of the Agreements as "essential obligations" Casco relies heavily on <u>Biomedical</u>. As to its perennial late payments, Casco argues that "Maruyama waived any such claim by continuously accepting late payments, and continuing to sell to Casco." Docket # 53, p. 15. In a similar vein, Casco contends that "the course of conduct established between the parties reflected Maruyama's acquiescence to Casco's consistent late payments." <u>Id.</u>, p. 3. For the reasons laid out below, these arguments are without merit, and Casco's reliance on <u>Biomedical</u> is misplaced.

For a start, contrary to <u>Biomedical,</u> where the parties "understood that overdue balances (at least in the amounts at issue) would not constitute grounds for terminating their relationship," 797 F.2d at 18, the Agreement explicitly provides that Casco's failure to "remit payments in a timely manner (not to exceed 90 days from due date)" constitute grounds for termination of the Agreement. Docket # 45-2, Exh. 1, p. 6.  And the irrefragable facts show that, from June 6, 2008 to June 25, 2009, Casco had 6 outstanding invoices over 90 days. More importantly, at the time of the Agreement's termination, Casco had an outstanding 90 day balance, and owed Maruyama a total of $57, 019.42.[3]  Because the Agreement, which was negotiated and agreed upon by the parties (and indeed signed by Casco's Rive), explicitly forewarned Casco that failing to remit

---

[3] Casco argues that only the invoices past due over 90 days should be relevant. Docket # 53, p. 4. While it is true that the Agreement authorizes termination only for payments due over 90 days, it cannot be seriously argued that payments due over 30 and 60 days are irrelevant. Such evidence is relevant because "it has the tendency to make a fact more or less probable than it would be without the evidence . . . ." Fed. R. Ev. 401 (a). Specifically, evidence of late payments show Casco's historical inability to make payments on time, among other examples that are consequential "[i]n determining the action." Fed. R. Ev. 401 (b).

payments exceeding 90 days constituted grounds for termination, it follows that such a covenant was an "essential obligation" that falls under the statutory definition of just cause. See Greenville Funeral Supply, LLC v. Rockvale, Inc., 597 F. Supp. 2d 241, 245 (D.P.R. 2008)(finding that terms "expressly set out" in  written agreement "quite clearly were essential obligations of the dealer's contract between the parties"); see also  Frigiking, Inc. v. Century Tire & Sales Co., 452 F. Supp. 935, 938 (N.D. Tex. 1978) (stating that a manufacturer was within its rights to canceled distributorship agreement due to defendant's large overdue balances); Richard M. Krumbein, Protectionism in Puerto Rico: The Impact of the Dealers' Contracts Law on Multinational Companies Planning Operations in Puerto Rico, 25 Case W. Res. J. Int'l L. 79, 99 (1993) (arguing that "an essential obligation would be one negotiated and agreed upon by the parties and included in the contract") (footnote omitted).

Moreover, whereas the supplier in Biomedical made clear "[t]hat the cash limitation of [the dealer] would never be a detrimental factor in their relationship," 797 F.2d at 18, Maruyama regularly complained about Casco's late payments. One of Guibert's e-mails, for instance, said, "it is important [that] we collect both the 90 day and 120 day amounts, and avoid being reviewed for referral to collections." In line with Maruyama's discontent, Guibert described Casco's indebtedness as an "urgent matter." Similarly, and in expressing Maruyama's dissatisfaction with the "payment plan" proposed by Casco, Guibert said: "it is necessary [that] I make this request to pay the amount in the 90 day column, and the . . . planned pay amount falls way short of the amount needed ($27, 945.09)." Docket # 55-6, pp. 3-4. This is compatible with Maruyama

**CIVIL NO. 10-1145 (SEC)**                                                    **Page 14**

placing several holds on Casco's orders until late payments were addressed. SUF ¶ 18(f). In sum, Biomedical does not aid Casco.

So, not only are Biomedical's "unusual . . . [and] abnormal circumstance[s]," PPM Chemical Corp., 931 F.2d at 140, not present in this case, but, as Maruyama correctly points out, the First Circuit appears to have rolled back Biomedical. In the 26 years that have passed since deciding Biomedical, the First Circuit has never applied this exception again. This brings us to Waterproofing.

Waterproofing is the First Circuit's latest pronouncement on this point. There, as in the instant case, a dealer was often late in its payments to the  supplier. 440 F.3d at 29. After the supplier began making direct sales of its products, the dealer filed suit under Law 75. "The magistrate concluded that because the [supplier] had not previously terminated the Distribution Agreement because of late payment, it could not suddenly change course without violating the principle enshrined in Law 75." Id. Disagreeing with the magistrate judge's rationale, the First Circuit described the lower court's conclusion as "troubling." Id. Thus, it disavowed the magistrate judge's apparent reliance on Biomedical, finding that "far from 'not caring' about the payment schedule, [the supplier] was in fact actively engaged with the project of trying to reduce [the dealer's] ever-growing debt." Id. The court further explained:

> It may well be that [the supplier] was willing to overlook the untimely payments because of [the dealer's] successful sales records for the first four years of their relationship. However, we think it quite possible that there was a limit to the supplier's patience. . . The magistrate would have us hold that while [the dealer's] indebtedness in March 2004 might have constituted just cause if it had been the first such occurrence, it could not legitimately have been the proverbial straw to

break the camel's back. We disagree. It is contrary to the principle enshrined in Law 75 to require that suppliers terminate distribution agreements immediately upon distributors' failure to pay timely, or risk being forever banned from so doing. Such a result would discourage efforts on the part of suppliers to reach creative solutions to enable the success of long-term relationships with distributors in Puerto Rico. Id. at 29-30.

Despite its disagreement with "the magistrate's disposal of [the supplier's] claim of just cause on the basis of [the dealer's] failure to pay timely," id. at 30, the First Circuit ultimately found no clear error on the magistrate judge's conclusion that the supplier had no just cause to terminate the distribution agreement, because its claim of just cause on the basis of late payments was merely a pretext for abrogating the parties' distribution agreement.[4] The court placed considerable weight on the fact that the supplier had congratulated the dealer's '"[e]xtraordinary job . . . For the second year in a row [the dealer] [was] at the top of the list of all our distributors in total sales.'" Id. In affirming the magistrate judge's holding, moreover, the First Circuit buttressed that the dealer "was within its credit limit and current in its payments." Id.

Unfortunately for Casco, the facts of this case are distinguishable from the ones the Waterproofing court relied on to affirm the lower court's questionable decision. Here, Casco has come forward with no evidence that Maruyama "congratulated" it for being at the top of the list of its distributors in total sales. Although Casco did not exceed its credit limit, Maruyama

---

[4] Because the Waterproofing appeal came before the First Circuit as a grant of preliminary injunction order, the First Circuit applied the more deferential "clearly erroneous" standard. See Waterproofing Sys., 440 F.3d at 28; Concilio De Salud Integral De Loiza, Inc. v. Perez-Perdomo, 551 F.3d 10, 15 (1st Cir. 2008). But given the First Circuit's obvious dissatisfaction with the magistrate judge's rationale, it is unclear if the lower court's decision would have survived de novo review.

nonetheless placed a hold on various of its orders because of its languishing debt. And, as opposed to the dealer in <u>Waterproofing</u>, Casco rarely was current in its payments (at least since early 2007). <u>Waterproofing</u>, then, does not carry the day for Casco.

Casco contends that, because Maruyama continuously accepted Casco's late payments and continued to sell to Casco, Maruyama waived its right to terminate the Agreement. Said differently, Casco invites this court to follow the magistrate judge's "troubling" rationale. The Court declines to follow this equivocated path. <u>See</u> <u>Waterproofing</u>, 440 F.3d at 30 ("It is contrary to the principle enshrined in Law 75 to require that suppliers terminate distribution agreements immediately upon distributors' failure to pay timely, or risk being forever banned from so doing."). The undisputed record here is replete with e-mails showing that, "far from 'not caring' about the payment schedule, [Maruyama] was in fact actively engaged with the project of trying to reduce [Casco's] ever-growing debt." <u>Id.</u> at 29. Indeed, even one of Guibert's emails explicitly states that Casco's systematic failure to keep its account "within manageable levels" affected <u>Maruyama's ability to sell its equipment</u>. That, combined with the various holds Maruyama was forced to place on some of Casco's orders no doubt "affect[ed] the interests of . . . [Maruyama] in promoting the marketing or distribution of the merchandise or service," P.R. Laws Ann. tit. 10, § 278, which in turn constitutes an independent ground for a just cause finding under Law 75. [5]

---

[5] As Galvan similarly testified on his deposition, due to Casco's consistent late payments, Casco's [a]ccount . . . [would] go on automatic freeze, and what I mean, we couldn't ship product to . . . [Casco]." Docket # 55-1, p. 29:6-9. It goes without saying that hindering its ability to sell and ship its products, adversely affected Maruyama's interests.

Casco's contention that "the course of conduct established between the parties reflected Maruyama's acquiescence to Casco's consistent late payments," is also without merit. At the outset, this argument misstates the record, as Maruyama never "acquiesced" to Casco's late payments. While it is true that Maruyama accepted Casco's late payments, it never "acquiesced" to them. To the contrary, and as explicated above, Maruyama's repeated complaints, which lasted for more than 2 years, were neither silent nor passive. Nor were they  without objection. See Webster's Third New International Dictionary 18 (2002) (defining acquiescence as "passive assent or submission"); 1 Shorter Oxford English Dictionary 20 (5th ed. 2002) (acquiescence means "silent or passive assent to, or compliance with, measures or proposals"); U.S. v. Rivera, 412 F. 3d 562 (4th Cir. 2005) ("Acquiescence consists of 'the act or condition of acquiescing or giving tacit assent; agreement or consent by silence or without objection.'" (quoting Webster's Unabridged Dictionary 18 (Random House, 2nd ed. 2001))).

Even assuming, arguendo, that Maruyama's accommodating flexibility and comprehension could be interpreted as acquiescing to Cascos' late payments, Casco cannot now use this as a sword with which to cut down the mutually negotiated Agreement. As another court in this district has said, "[t]hat [the supplier] tolerated due balances and attempted to resolve the dispute amicably through reasonable payment plans does not mean that they altered the terms and somehow excused [the dealer's] timely performance, however." Tatan Mgmt. v. Jacfran Corp., 270 F.Supp.2d 197, 201-02 (D.P.R. 2003) (citing Dyno Nobel, Inc. v. Amotech Corp., 63 F. Supp. 2d 140, 150 (D.P.R. 1999)); Nike Int'l, Ltd. v. Athletic Sales, Inc., 689 F. Supp. 1235,

1238 (D.P.R. 1988) ("The legislature [of Puerto Rico] did not intend that Law 75 be a safe haven

for dealers to avoid the express terms of the contracts to which they willingly subscribe."); cf.

Zapata Hermanos Sucesores v. Hearthside Baking Co., 313 F.3d 385, 389 (7th Cir. 2002)

(Posner, J.) ("Pacta sunt servanda, as the saying goes 'contracts are to be obeyed.'") (parenthesis

omitted), cert. denied, 540 U.S. 1068 (2003). Casco's submission, moreover, contravenes well-

settled principles of contractual law. See P.R. Laws Ann. tit. 31, § 3471 (evidence as to the

parties' intention only proper when the terms of the contract are not clear); see also Caribbean

Ins. Services v. American Bankers Life Assur. Co. of Florida, 754 F.2d 2 n. 6 (1st Cir. 1985)

("We do not think that the principles of Puerto Rico contract law allow a party to defeat a motion

for summary judgment by the mere invocation of 'the parties' intention' to introduce an

interpretation of the contract totally inconsistent with its clear terms.") (citations omitted).

Countenancing Casco's argument, more importantly, "[w]ould discourage efforts on the

part of suppliers to reach creative solutions to enable the success of long-term relationships with

distributors in Puerto Rico." Waterproofing, 440 F.3d at 30. And it would be fundamentally

unfair to punish Maruyama precisely "[f]or exercising [its] rights under the [Agreement] and

under Puerto Rico law to end a dealers' relationship that became unworkable." Tatan Mgmt., 270

F.Supp.2d at 204. By like token, it makes no sense to allow Casco, who requested (and received)

Maruyama's assistance in reducing its persistent cash flow constraints, to conveniently use the

Maruyama's well-intentioned cooperation against it. Such an outcome would turn Law 75 on its

head, forever chaining a supplier—that attempts to resolve a dispute amicably through

reasonable payment plans—from terminating an unworkable relationship with its dealer. Cf. Medina & Medina v. Country Pride Foods, Ltd., 858 F.2d 817, 823 (1st Cir. 1988) (per curiam) (refusing to construe Law 75 in such a way that a dealer could govern its supplier's policies resulting in supplier's loss of legal and financial autonomy) (reproduction of official translation of Puerto Rico Supreme Court's response to certification question, 122 P.R. Dec. 172 (1988)).

True enough, thanks to Maruyama's cooperation, Casco effectively reduced its outstanding invoices due over 90 days to $0 by the beginning of June 2009. But by the end of that month, Casco returned to its old habits, owing $4,360 on debt due over 90 days. As noted above, according to the invoice preceding Maruyama's letter of termination, Casco owed a total of $57,019.42. Docket # 45-3, p. 27. Casco's latest debt ultimately prompted "Maruyama U.S. upper management" to terminate the Agreement. Docket # 55-1, p. 31:4. This set of facts, then, fits the mold of a "[s]ituation in which a supplier does not take action to terminate its relationship with a distributor for late payments until many such occurrences have genuinely exhausted its patience." Waterproofing, 440 F.3d at 30. Maruyama's loss of patience with Casco's late payments is best exemplified by Galvan's testimony. When asked whether he recommended that Casco be terminated, Galvan answered: "It was not my initiative. I couldn't defend them [Casco] anymore. . . . I couldn't come up with a schedule they [Casco] w[ould] follow up." Docket # 55-1, p. 31:11-15.

Next, Casco repeatedly complains that Maruyama never "threatened" it to terminate the Agreement. But because this ipse dixit was "[a]dverted to in a perfunctory manner [and]

**CIVIL NO. 10-1145 (SEC)**                                                    **Page 20**

unaccompanied by some effort at developed argumentation," United States v. Hughes, 211 F.3d

676, 684 n.6 (1st Cir. 2000) (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)),

the Court deems it waived. Casco has provided no legal authority for the proposition that, in

order to validly terminate a distribution agreement under Law 75, a supplier must "threaten"

termination. In this circuit, passing reference to legal phrases and case citation without

developed argument is insufficient to defeat waiver. E.g., DiMarco-Zappa v. Cabanillas, 238

F.3d 25, 34 (1st Cir. 2001) ("Simply noting an argument in passing without explanation is

insufficient to avoid waiver."). At any rate, and as already made abundantly clear, the

Agreement, which required no such prior "threats," gave Casco ample notice as to the grounds

for termination.

*Casco's other noncompliances with the Agreement*

Not only did it have good cause to terminate the parties' relationship because of Casco's

repeated late payments, but Maruyama's good cause defense is bolstered by Casco's other

noncompliances with the Agreement. As previously related, Casco failed to (1) furnish

Maruyama the Monthly Inventory & Sales Reports; (2) participate in Maruyama's 2008-2009

booking program; and (3) hire and train outside sales personnel to assist in the marketing of

Maruyama's products.

As to the Monthly Inventory & Sales Reports, Casco appears to concede (Docket # 53,

p. 11) that it failed to provide Maruyama with what the Agreement labels as "necessary

information." Docket # 45-2, p. 7. Casco, however, faults Maruyama for never requesting these

**CIVIL NO. 10-1145 (SEC)**                                                                 **Page 21**

reports. Without pointing to any evidence, Casco posits that "the record of this case is bereft of any such request." Docket # 53, p. 11. Casco's excuses are meritless. First, Casco's protestations run afoul of the record; Galvan testified that he sent an e-mail in the middle of each month requesting "these monthly inventory reports." Docket # 55-1, p. 45:13-25. Second, such a lackluster effort by Casco surely cannot defeat Maruyama's properly supported fact; Casco had to come forward with a supporting showing in order to create a genuine issue of material fact. See Ahern v. Shinseki, 629 F.3d 49, 54 (1st Cir. 2010) (reiterating that the nonmovant must produce "specific facts sufficient to deflect the swing of the summary judgment scythe") (internal quotation marks omitted).[6] Above all, the Agreement describes these reports as being "critical to inventory and production planning," and explicitly says that "failure to provide this information on a consistent basis will result in the termination of the Distributor." Docket # 45-2, p. 7.

As to its refusal to participate in Maruyama's 2008-2009 booking program, Casco advances similar but unavailing excuses. Conceding that it "decided" to no longer continue with the booking program, Casco argues that such a program "made no sense" to it. Docket # 53, p. 11. For Maruyama, by contrast, the booking program "was very important." Docket # 55-1, p. 44:7-11. "Otherwise," Galvan explained in his deposition, Maruyama "couldn't have that

---

[6] Casco cites Rive's deposition to support its contention that Maruyama never requested these documents. See Docket # 54, ¶ 21. But Rive's deposition testimony does not support such a showing. When asked about the Reports, she made clear that she was not "the person to ask that question to." Docket # 51-1, p. 33:3-7. "If they [Maruyama] did request it, it must have been sent. But it wasn't done by me, so I have no recollection." Id., p. 72:8-10. Because Rive lacked the requisite "personal knowledge of the matter," Fed. R. Ev. 602, her testimony is disregarded.

product available." Id. Far from not caring, as Casco incorrectly alleges, the record thus shows that Maruyama did care about this important matter. Be that as it may, the Agreement made it pellucidly clear that a distributor's "failure to participate in the annual production planning program . . . [is] considered a termination action unless otherwise agreed to in writing by [Maruyama]." Docket # 45-2, p. 6. And Maruyama, of course, never agreed to that in writing.

Lastly, Casco likewise appears to concede its failure to hire and train outside sales personnel to assist in the marketing of Maruyama's products. In a similar rebuttal, Casco maintains, without providing any citations, that Maruyama never made such a request. But Casco's contention is neither supported by (see note 2, above) nor compatible with the record. Contrarily, Galvan testified in his deposition that Casco "really wanted to do it, truly [to hire outside sales personnel]. They wanted to hire somebody. [But] [t]hey didn't get to it." Docket # 55-1, p. 45:10-12. The evidence of record thus shows that Casco also breached this provision of the Agreement, which in turn constitutes another ground for termination. Docket # 45-2, p. 6.

Casco rehashes its (previously rejected ) argument that Maruyama never "threatened" or "warned" it that the foregoing noncompliances with the Agreement constituted grounds for termination. This argument is unpersuasive and can be discarded out of hand. Suffice it to reiterate that this contention was adverted to in a perfunctory matter, and that neither the Agreement nor Law 75 requires that a supplier "threaten" termination in order to validly terminate a distribution agreement. In any event, when Casco's counsel asked Galvan if he

issued such warnings, Galvan riposted: "No. We didn't treat our distributors like that. It was part of the contract . . . ." Docket # 55-1, p. 46: 20-23. The Court declines to second-guess Maruyama's diplomatic business approach. See Balser v. Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers (IUE) Local 201, 661 F.3d 109, 120, 2011 (1st Cir. 2011) ("Our role is not to second-guess the business decisions of an employer." (quoting Rossy v. Roche Prods., Inc., 880 F.2d 621, 625 (1st Cir. 1989))).

Accordingly, the cumulative weight of Casco's other contractual breaches, even if deemed non-essential, were nonetheless detrimental to the parties' relationship and, as elucidated above, "adversely and substantially affected the interest of the principal or grantor in promoting the marketing or distribution." P.R. Laws Ann. tit. 10, § 278; cf. Vulcan Tools v. Makita USA, 23 F.3d 564, 569 (1st Cir. 1994) ("The question whether there has been a 'detriment' to the existing relationship between supplier and dealer is just another way of asking whether the terms of the contract existing between the parties have been impaired.") (emphasis added). Such breaches, together with Casco's repeated infractions of the Agreement's (undisputably essential) covenant regarding late payments, suffice to conclude that Maruyama has carried its "burden of persuasion on the factual elements of the 'just cause' showing." R.W. Int'l Corp., 88 F.3d at 52 (citations omitted). Viewing the evidence in the light most favorable to Casco, Maruyama had just cause to terminate the Agreement.

**CIVIL NO. 10-1145 (SEC)**                                              **Page 24**

*The alleged pretext*

In an effort to blunt the force of the foregoing conclusions (and to concoct an issue of material fact), Casco takes out of proportion the circumstances preceding the Agreement's termination. Casco's theory, as related, is that "Maruyama's stated grounds for just cause are merely an after-the-fact pretext for terminating the Agreement and switching distributors in Puerto Rico." Docket # 53, p. 3. For the reasons set forth below, Casco's last ditch attempt falls short of creating a genuine issue of material fact.

Casco first makes much of the fact that Maruyama's termination letter did not attribute to it an "act or termination with regards to the Agreement." Id., p. 15. As previously indicated, the July 20, 2009 termination letter, which was written by Glaze, stated as follows: "Maruyama has elected to take a different approach concerning the market areas currently covered by Casco. Under the terms of the Agreement, Maruyama is giving Casco a 30 day notice of termination of said Agreement." Docket # 45-5, p. 1 (emphasis added). Maruyama, on the other hand, alleges that the phrase "under the terms of the Agreement" means exactly what it says: that the termination was being performed under the terms of the agreement. Docket # 45, p. 12.

Maruyama's termination letter could have been better drafted. That is to say, it could have provided a succinct explanation of Casco's breaches of the Agreement. The termination letter could have also explained Maruyama's just cause to terminate the Agreement. It may well be that such omissions were caused by Maruyama's failure to "consult with a Puerto Rico lawyer prior informing [Casco] of the termination of the relationship." Docket # 55-1:47-22-25. Regardless,

and as correctly pointed out by Maruyama, Law 75 simply requires that there be just cause for a dealer's termination. "There is no requirement . . . that the [supplier] send the [dealer] a written communication detailing every possible basis for termination of a contract," Maruyama further maintains. Docket # 45, p. 12 n. 1. The Court agrees with Maruyama. Casco has pointed to no case law, and this court has found none, that imposes such a requirement on a supplier. To the extent that Casco's argument is unsupported by any authority, the Court rejects it. At any rate, there being ample just cause to terminate the Agreement, it is of no consequence whether the termination letter is bereft of a "just cause" discussion. Put another way, whatever infirmities the termination letter may harbor do not negate the fact that Maruyama had just cause to terminate the Agreement. This situation is a prime example of the adage that courts favor "substance over form."

Undeterred, Casco also makes a big fuss over the Agreement's use of the phrase "a different approach." According to Glaze's deposition, this meant "a very nice way of telling somebody that we're going to go with another distributor in your area." Such a definition is frankly obvious. It is similarly unsurprising that both Glaze and Galvan admitted in their depositions that, at the time of termination, Maruyama had been looking at "fall back positions" for other companies that could sell Maruyama's product in Puerto Rico. It is therefore no surprise that, in order to avoid a severe disruption in its sales, a dissatisfied supplier would look at "fall back positions" prior to terminating its incompetent dealer. Prohibiting such a sensible decision, a result implicit in Casco's proffer, would deal a severe blow to our free enterprise

system. Cf. White v. Mass. Council of Constr. Emplrs, 460 U.S. 204, 218 (1983) (Blackmun, J.,

dissenting) ( "[A] seller's or purchaser's simply choosing its bargaining partners . . . [has] 'long

recognized' as the right of traders in our free enterprise system.").[7] Therefore, that Maruyama

looked at other dealers at the time of the Agreement's termination does no good for Casco.

In its relentless effort to create a genuine issue of motive and intent, Casco next reads too

much into Galvan's admission that, at the time of termination, Maruyama was unsatisfied with

the levels of sales that Casco was generating. Such an admission, Casco maintains, "casts

enormous doubt as to Maruyama's true motive for termination." Docket # 53, p. 19. The Court

disagrees. The short of it is that Casco has failed its burden of coming forward with competent

evidence to create a genuine controversy on this front.

Admittedly, after drawing all inferences in favor of Casco, see Certain Interested

Underwriters at Lloyd's v. Stolberg, 680 F.3d 61, 65 (1st Cir.2012), a reasonable jury could infer

that Casco's ineffectiveness may have been a factor to terminate the Agreement. After all,

Casco's President himself made it clear to Maruyama that Casco's sales had been at a historical

low level. It is not surprising, then, that Maruyama was well aware of Casco's ineffectiveness.

---

[7]As one commentator has said:

[U]nless a manufacturer is vertically integrating or is going out of business, the
manufacturer's interest will almost always lead it to search for and negotiate with
a potential new distributor to replace a dealer that is to be terminated. If this conduct were
forbidden, then the manufacturer's legitimate interest in maintaining adequate service
to its customers would be jeopardized. Charles J. Faruki, The Defense of Terminated
Dealer Litigation: A Survey of Legal and Strategic Considerations, 46 Ohio St. L.J. 925,
959 (1985) (emphasis added).

**CIVIL NO. 10-1145 (SEC)**                                                      **Page 27**

But given the solid evidence pointing Casco's other contractual breaches, especially the consistency of Casco's late payments, Casco's convenient theory that poor performance was the "true" factor is mere speculation. See Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) ("Even when elusive concepts like motive or intent are in play, 'summary judgment may be appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.").

Casco's "true factor" theory, crucially, runs afoul of the irrefragable evidence of record. When asked what made Maruyama decide to terminate the Agreement, Galvan testified: "The consistency on that account being delinquent, I believe that was the determinate factor for that decision." Docket # 55-1, p. 30:16-18. As explained, the record fully supports Galvan's testimony to that effect. Casco's argument on this point, therefore, misses the mark.

Finally, Casco similarly makes a big deal over four e-mails that Maruyama sent to Casco in the months preceding the Agreement's termination. See Docket # 55, ¶¶ 9-12. Three of these e-mails—sent after Casco either made an overdue payment or came up with a new payment plan—merely contain boilerplate business language, expressing Maruyama's "gratefulness" and "appreciation" for Casco's efforts (indeed, its obligation) in maintaining its account in "good order." See id. ¶¶ 9-11. The Court need not tarry long here, as such e-mails neither create a contradiction nor support Casco's "true factor" theory.

The last e-mail, written by Sargent, Maruyama's International Support Coordinator, on April 8, 2009, deserves a few remarks. This e-mail similarly shows appreciation for "the effort

that [Casco] is doing to bring the account, <u>as we strongly want to keep making business with you</u>

<u>guys</u>." <u>Id.</u> ¶ 12 (emphasis added). Casco argues that this evinces Maruyama's "emphatic[] desire

to continue its relationship with Casco." Docket # 53, p. 15. But Casco's interpretation is way

off the mark. To begin with, Sargent was not Maruyama's decisionmaker. As said, it was

"Maruyama U.S. upper management" who decided to terminate the Agreement. Docket # 55-1,

p. 31:4. Moreover, while close temporal proximity between relevant events can give rise to an

inference of pretext, <u>e.g.</u>, <u>Hodgens</u> v. <u>Gen. Dynamics Corp.</u>, 144 F.3d 151, 168-70 (1st

Cir.1998), the Agreement's termination occurred more than three months after Sargent's e-mail,

following Casco's return to its old habits of having balances due over 90 days. Lastly, Sargent's

comment is akin to the kind of isolated stray remark by a nondecisionmaker that the First Circuit

has held has limited probative value. <u>Cf.</u> <u>Gonzalez</u> v. <u>El Dia, Inc.</u>, 304 F.3d 63, 69 (1st Cir.

2002) (explaining that in the context of an age discrimination claim, " 'stray workplace remarks,'

as well as statements made either by nondecisionmakers or by decisionmakers not involved in

the decisional process, normally are insufficient, standing alone, to establish either pretext or the

requisite discriminatory animus") (citation omitted). After reviewing this alleged inconsistency,

the Court finds it to be insignificant at best and too minor to give rise to an inference of pretext.

<u>See</u> <u>Lucas</u> v. <u>Dover Corp.</u>, 857 F.2d 1397, 1402 (10th Cir.1988) (concluding instances of alleged

contradictions and inconsistencies were too insubstantial to allow a reasonable jury to infer

pretext).

Moreover, the issue of pretext is of marginal relevance to this case.  It is common ground that "[c]ourts should be especially cautious before granting summary judgment when pretext and retaliatory animus are at issue." Harrington v. Aggregate Industries-Northeast Region, Inc., 668 F.3d 25, 33 (1st Cir. 2012). But such concerns are mostly circumscribed to employment discrimination actions. See, e.g., id. Here, where the record is abundantly clear that Maruyama had just cause to terminate the Agreement, Maruyama's alleged "true motive" loses relevance. It would be another story, of course, if, as in Waterproofing Sys, the record was devoid of so many breaches of the Agreement.

In sum, Casco's efforts to create a genuine issue of material fact, while creative, do not withstand scrutiny. Because no rational trier of fact could infer pretext from Casco's attempts to create an issue of material fact, summary judgment is proper. This ends the matter.

Assuming for the sake of argument that Maruyama's "true motive" was Casco's (conceded) poor performance, summary judgment would still be appropriate. Cf. Jones v. Potter, 488 F.3d 397, 408-409 (6th Cir. 2006) ("The question . . . becomes whether those true motivations were, in fact, unlawful. If not, then the issue of pretext would be immaterial, making summary judgment appropriate."). Casco's acknowledgment that its sales were a historical low level provides Maruyama with another, independent ground "just cause" ground. That is, to the extent that the levels of sales that Casco was generating were subpar, a finding of "just cause" is warranted. See Luis Rosario, Inc. v. Amana Refrigeration, Inc., 733 F.2d 172, 173 (1st Cir.1984) (Breyer, J.) (confirming district court's finding of just cause  due to dealer's poor

performance); accord, e.g., Chandler Supply Co. v. GAF Corp., 650 F.2d 983, 989 (9th Cir. 1980) (permitting a supplier's "attempt to improve its distribution system by eliminating a dealer considered ineffective and replacing him with a more efficient one"); L-O Distributors, Inc. v. Speed Queen Co., 611 F. Supp. 1569, 1582 (D. Minn. 1985) (holding that a termination for poor performance does not run afoul of state dealer law). Ironically, Casco's  theory, it turns out, ultimately proves fatal to its attempt to defeat summary judgment.

*Casco's claims for breach of contract and breach of duty of good faith*

As indicated in the beginning, Casco's complaint contains a cause of action for breach of contract. Casco alleges that "[t]he unwarranted termination of the Agreement constituted a breach of contract . . . ." Docket # 1, ¶ 14. The complaint similarly alleges that the unwarranted termination of the Agreement constitutes "actionable breach of  Maruyama's continuing duty to act in good faith . . . ." Id. ¶ 16. In one sentence, Maruyama maintains that because the termination of the Agreement "[w]as justified pursuant to its specific terms . . . , these claims must be also dismissed with prejudice." Docket # 45, p. 15. Casco demurs, arguing that even if there were a finding of just cause under Law 75, that does not necessarily entail the dismissal of these claims. Docket # 53, p. 18.

While the Court does not appreciate Maruyama's lackluster discussion on this front, it nevertheless concurs with Maruyama that the issue is simple and clear-cut.[8] As related above,

---

[8] While the Court is tempted to deem Maruyama's argument waived, in the interest of judicial economy, see Fed. R. Civ. P 1, the Court will entertain it. See City of Bangor v. Citizens Communs. Co., 532 F.3d 70, 99 (1st Cir. 2008) (A district court enjoys inherent power to 'control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'"

**CIVIL NO. 10-1145 (SEC)**                                                              **Page 31**

Casco's alternate claims depend on Maruyama's "unwarranted termination of the Agreement."

But, as elucidated through this opinion, Maruyama's decision to terminate the Agreement was

not unwarranted, as it was indeed made pursuant to its terms. To the contrary, it was Casco who

repeatedly violated the terms of the Agreement. Consequently, these claims are summarily

dismissed.

**Conclusion**

For the reasons stated, Maruyama's motion for summary judgment is **GRANTED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 2nd day of November, 2012.

*s/Salvador E. Casellas*
SALVADOR E. CASELLAS
U.S. Senior District Judge

---

(quoting <u>Landis</u> v. <u>N. Am. Co.</u>, 299 U.S. 248, 254 (1936)); <u>Taunton Gardens Co.</u> v. <u>Hills</u>, 557 F.2d 877, 879 (1st Cir. 1977). Moreover, Casco has also failed to provide any authorities supporting its argument that these causes of action can survive notwithstanding this court's holding that Maruyama's termination of the Agreement was not unwarranted.